# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-DP-01030-SCT

*JAMES EARNEST WATTS a/k/a "SQUIRREL"*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 8/09/96 |
| TRIAL JUDGE: | HON. R.I. PRITCHARD, III |
| COURT FROM WHICH APPEALED: | MARION COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MORRIS SWEATT |
| | JOHN HOLDRIDGE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LESLIE S. LEE |
| DISTRICT ATTORNEY: | RICHARD L. DOUGLASS |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY-DIRECT APPEAL |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART-1/28/99 |
| MOTION FOR REHEARING FILED: | 2/11/99 |
| MANDATE ISSUED: | 5/13/99 |

**EN BANC.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. James Earnest Watts was found guilty of capital murder and sentenced to death in the Circuit Court of Marion County on August 9, 1996, by a jury impaneled in the Circuit Court of Lincoln County. He now appeals to this Court, raising twenty assignments of error. Most of the issues he raises are procedurally barred or otherwise waived. We find that the circuit court failed to properly instruct the jury regarding the three sentencing options available in capital murder cases pursuant to Miss. Code Ann. § 97-3-21(1994), and therefore reverse as to the sentencing phase. There is no merit to the remaining issues raised. Accordingly, we affirm the jury's finding that Watts was guilty of capital murder and reverse and remand for re-sentencing proceedings, consistent with this opinion.

## I.

¶2. The semi-nude body of ten-year-old Vanessa Nicole Lumpkin was found stuffed in the roots of a tree

along a creek bank in Columbia, Mississippi around noon on December 20, 1993. Alex Fairley discovered the body while taking a short cut home from the nearby Hendricks Street Apartments, known as "the projects." He ran back to the apartments, showed his friends what he had seen, and Ruby Lewis called the police. Just a few minutes earlier, police had received a report that the child was missing.

¶3. Officers Tim Singley and Doug Brewton of the Columbia Police Department were the first to arrive at the scene. They immediately roped off the area around the body. Detective Carroll Bryant, along with Detective James Carney, next arrived. Detective Bryant indicated that the ground was scuffled, but there was nothing from which a footprint could be cast. There was very little blood on or around the body. A little green shirt that the child had been wearing when she went to bed the night before was found about thirty yards away, west of the projects and the creek, near the Rest Haven Cemetery.

¶4. Anthony Lumpkin identified his daughter's body at the scene. Marion County Coroner Norma Williamson took measures to protect the body from contamination, wrapping it in a sheet before she moved it. Rigor mortis had set in. Both Williamson and Mississippi State Highway Patrol Crime Scene Specialist Don Sumrall indicated that there was a bloody discharge in the genital and rectal areas. Based on the vaginal drainage, Williamson determined that the child appeared to have been sexually abused. She observed marks on the child's neck and what appeared to be ligature marks on her wrists. There was an abrasion on the right side of her chin, and blood on her tongue where she had bitten it.

¶5. State Medical Examiner, Dr. Emily Ward, performed an autopsy on the child. Cause of death was found to be cardiorespiratory arrest due to strangulation, air embolism and a perineal laceration. Based on an external examination, Dr. Ward initially had thought the cause of death was strangulation, based on linear abrasions on the neck and petechial hemorrhages on the eyelids. However, an internal examination revealed that bubbles in the arteries of her heart had caused a fatal air embolism. Tracing the path of bubbles in the bloodstream, Dr. Ward determined that a tear in the vaginal wall was the source of the embolism. Bruising in the perineal area indicated that penetration occurred while the child was still alive. Dr. Ward, however, was unable to determine whether penetration had involved a penis or some other object. She explained that there was very little blood because the child would not have lived long after the vaginal tear occurred. She confirmed Coroner Williamson's observation that the injuries on the child's wrists were caused by some binding.

¶6. Vanessa Nicole Lumpkin's grandfather, Joe Geeseton, had died at the VA Hosptial in Jackson on December19, 1993. Nicole, along with many other family members and friends, was staying with her grandmother, Ruthelle Geeseton, who lived just around the corner from the Lumpkins. Pauletta Baxter, a close friend of the family who was Watts' estranged girlfriend and mother of his child, had been staying at the Geeseton house because of problems she was having with him. She put Nicole, along with her daughter, Victoria, to bed between midnight and 1:00 a.m. in the back bedroom at the Geeseton house. Mrs. Geeseton awakened at 4:00 a.m. She testified that when she checked on the little girls, she noticed that the closet light, kept on for Baxter's and Watts' daughter, Victoria, was not on and that Nicole wasn't there, but assumed that she had gone home with her parents. Baxter, too, testified that everyone at the Geeseton house assumed that the child was at the Lumpkins' house. The Lumpkins thought she was still asleep at her grandmother's house, since she had been up very late the night before and Gwen Geeseton Lumpkin had left her there when she went home around 1:30 a.m. Anthony Lumpkin stated that when the child stayed at her grandparents, she usually awakened early and walked home, so she had not been missed there. Apparently, no one saw her leave the house. After Lumpkin called the Geeseton house, and it was

determined that she was not at either house, Pauletta Baxter called the police to report the child missing.

¶7. Anthony Lumpkin suggested to authorities that they question Watts because of the way he watched the child when she danced and because he had seen Watts riding a bicycle that recently had been stolen from her. Detective Bryant testified that they interviewed several other people in addition to Watts, but never came up with any other suspects. David McDaniel, an investigator with the Columbia Police Department, obtained consent from Watts' mother to search Watts' room at her house. There they found the multi-colored jacket Watts reportedly had been wearing the evening before and which his mother identified as his, as well as some tennis shoes, a towel and a pillow case. Noting that there had been some rain in the early morning hours of December 20, McDaniel testified that the jacket was still damp.

¶8. Willy Carter testified that he had picked Watts up at his house and dropped him off at Hendricks Street, near "the projects" at around midnight and did not see him again until 1:00 or 1:30 p.m. the next day. He stated that it was drizzling and rainy at the time. Catherine Bullock heard Watts "bamming" on the door of her neighbor in "the projects," Pauletta Baxter, at around 12:00 or 12:30 a.m. He was wearing a multi-colored patchwork jacket. She testified that he was acting strange that night, but stayed around for awhile with a group of people who were drinking and shooting off fireworks. He wanted to talk with her about his relationship with Baxter. When he asked her where Baxter was, she told him that she was at the Geeseton's. She testified that he came back about two hours later, stating:

> Squirrel left. And when he came back, he was gone I say about two hours. He came back and he said, "Michelle," he said, "I done something." I said, "What?" And he said, "I done something." He said, "And I need to tell somebody." I said, "Well, what have you did?" But he never told me. And he told me he was about to go home. And at that time Squirrel didn't have on the same clothes that he had on when he left.

He was no longer wearing the multi-colored jacket, and instead was wearing a T-shirt and some kind of jogging pants.

¶9. Tyrone Alexander had noticed Watts standing around the apartments that night, "looking kind of strange." Watts' second cousin, Travis Smith, likewise placed him at the projects, near Building D, after midnight, noting that Watts was wearing a multi-colored jacket he hadn't seen before.

¶10. Watts was picked up for questioning by police on December 20th. He was questioned by Officer Sumrall and consented to having his clothing examined for evidence. He was wearing stained black shorts, as well as a T-shirt, briefs, socks, sweat pants, sweat shirt, a regular shirt and some overalls. Sumrall did not notice whether any of the clothing touched the floor when Watts removed it. Watts put his underwear in a bag himself. He handed each of the other items as he removed them to Sumrall, who put them in the bags. Sumrall wore gloves while the evidence was being collected.

¶11. At the Mississippi State Crime Laboratory, Debbie Haller examined and tested Watts' clothing for blood, seminal fluid, hair, fibers and any other identifying material. Blood stains were identified on the back of the jacket. Stains on the inside front of Watt undershorts, a few inches below the left side of the waistband, tested positive for blood with the possible presence of feces.[1] Haller further testified at length about the precautions taken in the laboratory to prevent contamination of evidence being readied for DNA testing. Samples collected from Watts and the victim, as well as samples of stained areas from Watts' jacket and undershorts, were sent to GenTest Laboratories in Metarie, Louisiana for DNA testing. The lab used

the polymerase chain reaction (PCR) method of amplifying DNA to type genetic material derived from the evidence submitted. From the test results, it was concluded that the victim could not be excluded as the source of the DNA obtained from the blood stain samples taken from Watts' jacket. Watts, however, was excluded as a possible "donor" of the stains on the jacket. As to the samples taken from blood stains on his undershorts, the results indicated a mixture of two types, one consistent with the genetic markers identified as belonging to Watts, and the other, consistent with those of the victim. Based on the product rule of determining the statistical probability "that another individual picked at random off the street could also produce the ten-test stain that was found on the jacket," the State's expert witness, Dr. Martin Tracey, calculated that one in a little over eight hundred thousand African Americans would match. Using the more conservative ceiling approach to calculating population frequency, he previously had calculated the likelihood of a match at one in forty thousand. Dr. Sinha, president of GenTest Labs, based on a testing for ten different genetic markers and applying the ceiling principle, calculated that there was a one in 876,000 chance in the black population group of finding another individual whose genetic profile would match, and a one in twelve million chance in the white population.

## II.

¶12. Watts was indicted by a grand jury in Marion County on April 19, 1994 for the killing of Vanessa Nicole Lumpkin, a female child under the age of twelve years old, while in the commission of a sexual battery in violation of Miss. Code Ann. § 97-3-19(2)(e)(1994). After Watts was granted three motions for continuances, his trial was scheduled for August 29, 1995. A mistrial was declared, however, when the venire panel was exhausted before a jury was selected. Trial was reset for March 4, 1996. At that point, Watts was granted still another motion for a continuance, arising from the defense's *ore tenus* motion to quash the venire panel. As the circuit court further stated in his written opinion:

> On February 9, 1996, it was discovered that Lincoln County had exhausted the potential jurors in the jury box and on February 12, 1996, Delta Computer Company incorrectly advised the Lincoln County Circuit Clerk to fill the jury box with the first seven hundred (700) names from the jury wheel, and the venire panel for this case was chosen from those seven hundred (700) names.

> That the venire panel so drawn from the jury box was comprised only with persons with the name beginning "A", "B", or "C". That the State and the Defense is entitled to a venire that is a random selection of jurors in Lincoln County and the jury wheel should have keyed in a number to ensure enough jurors to make the jury box show a random sample.

> That the State and the defense agree that the methodology employed systematically excluded any qualified electors whose name began with the letters "E" through "Z", and that selection of this panel would have been reversible error.

The circuit court found that the delay in the proceedings was not chargeable to either party for purposes of the speedy trial rule. Trial, originally re-slated for June 24, 1996, was reset for August 5, 1996, because of a scheduling conflict with the defendant's DNA expert.

¶13. Trial was held on August 5-9, 1996. A jury was impaneled in Lincoln County and trial was held in Marion County. At the close of the State's case, Watts' motion for a directed verdict was denied by the circuit court. The jury found Watts guilty of capital murder.

¶14. During the sentencing phase of the trial, the jury heard only the testimony of Watts' mother, who briefly testified that he was raised by her and his grandmother, that he was the best of her eight children, and that he had been popular in high school, having been voted by his classmates as "best dressed" and receiving a standing ovation at his graduation. The jury then unanimously found that at the time of the commission of the capital murder:

> 1. That the defendant actually killed Vanessa Nicole Lumpkin;

> 4. That the defendant contemplated that lethal force would be employed.

The jury unanimously found further that the aggravating circumstances of:

> 1. The Capital Murder was committed while the defendant was engaged in the Commission of the Crime of Sexual Battery or in an attempt to Commit the Crime of Sexual Battery; [and]

> 2. The Capital Murder was especially heinous, atrocious or cruel;

> are sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances, and we further find unanimously that the defendant should suffer death.

The circuit court entered an Order of Conviction on August 9, 1996. Watts filed a motion for j.n.o.v., or in the alternative, for a new trial, on August 28, 1996. The motion was denied the same day. Aggrieved by his conviction and sentence, Watts now raises twenty assignments of error.

## III.

## DISCUSSION OF THE LAW

### I. WHETHER THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO PRECLUDE PCR EVIDENCE

¶15. Watts presented only one witness at trial, DNA expert Dr. Ronald Acton, whom he called upon to refute the DNA evidence introduced by the State. In this appeal, as well, Watts largely predicates his assertion that he was deprived of his constitutional rights upon various issues arising from the State's presentation of its DNA evidence. He first contends that the polymerase chain reaction (PCR) method of typing DNA evidence used by GenTest Labs to test the evidence in this case has not been accepted by this Court as a generally accepted forensic technique capable of producing reliable results, and thus, the circuit court should not have admitted the evidence.

¶16. Watts filed a motion in limine to preclude evidence of DNA testing based on the PCR method of genetic typing. At the hearing on the motion, the circuit court heard extensive testimony by Dr. Acton as well as by Dr. Sinha, who operates the laboratory where the tests were made and who analyzed the evidence in this case. Based on that testimony, using the analysis set out in *Polk v. State*, 612 So. 2d 381 (Miss. 1992), the circuit court found that evidence of DNA testing, regardless of whether the PCR or RFLP method was employed, was admissible.

¶17. This Court first found the Restriction Fragment Length Polymorphism (RFLP) method of typing DNA evidence to be admissible in *Polk.*

¶18. Watts emphasizes the third prong of the *Polk* test, looking for error in the preparation of the DNA samples used in his case. His expert, Dr. Acton, focused on the susceptibility to contamination inherent in the PCR amplification process. Dr. Sinha and Pat Wojtikieiac, however, explained the controls in the laboratory process which are designed to identify - and minimize- any instances of contamination. Deborah Haller further demonstrated the precautions taken by the State Crime Lab to safeguard against contamination of the samples prepared for the genetic laboratory.

¶19. Watts, however, attempts to bolster his case by misconstruing evidence and mis-characterizing witness testimony in the record, speculating where contamination might have occurred. He suggests that Don Sumrall could have contaminated the evidence by not wearing protective coverings on his shoes while "traips[ing] about the crime scene" since the sort of rectal and vaginal injuries the child suffered "would have caused significant bleeding." Crime scene pictures show only a small trickle of blood coming from the perineal area; witness testimony indicated there was little blood at the scene and the State Medical Examiner testified that because death would have occurred swiftly after the injury, there would have been very little bleeding.

¶20. Watts further mis-characterizes Sumrall's testimony about Watts' removal of his clothes, stating that "He [Sumrall] further conceded that the undershorts might have dropped to and touched the floor of the small office during the collection." Rather, when asked, Sumrall testified that he didn't notice whether Watts' undershorts touched the floor before he put them in the bag.

¶21. He further suggests that the victim's blood may have been present on his jacket because Sam Howell, Chief of Toxicology at the Mississippi Crime Lab, assisted Dr. Ward with the autopsy one day and the next, collected three items of evidence, including the jacket! While this raises matters of Mr. Howell's personal hygiene that were not made part of the record, his contention is also refuted by Deborah Haller's testimony regarding the rigorous protocol followed to avoid contamination in the crime lab.

¶22. This Court has found that PCR testing of DNA samples produces reliable results in a forensic setting. The record contains no evidence of error in the process of collecting and testing the DNA evidence in this case. We therefore do not find the circuit court to be in error for denying Watts' motion to suppress the evidence.

## II. WHETHER THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO STRIKE THE PROSECUTION'S DNA PCR EVIDENCE PERTAINING TO THE APPELLANT'S UNDERSHORTS

¶23. Watts asserts that circuit court erred in overruling his motion to strike the State's PCR evidence regarding stains found on the inside of his undershorts. At trial, evidence was presented that the undershorts Watts was wearing when he was taken in for questioning contained a mixture of DNA evidence that was consistent both with his genetic profile and that of the victim. Although statistical data was introduced about the DNA evidence which was identified as consistent with the victim's on Watts' jacket, no corresponding statistical data on the mixed sample found on the inside of Watts' underwear was offered by the State. While the circuit judge found that statistical data had probative value, he also found that because of the mixed sample on the shorts, Dr. Tracey could not generate any statistical data with the same certainty that he was able to achieve on the jacket. He further ruled that even without statistical data, evidence of DNA samples taken from Watts' undershorts still had probative value and thus denied the defendant's motion to

strike. Based on *Hull v. State*, 687 So. 2d 708 (Miss. 1996), Watts now asserts that it was error to introduce the DNA evidence without any population frequency estimates on the mixed sample since it was introduced on the jacket. He raises this claim despite testimony by his own expert witness, Dr. Ronald Acton, that *any* evidence of mixed DNA samples needs to be viewed with great caution.

¶24. This Court has held that "where the trial court finds that evidence of a DNA match is admissible as relevant, the court should also allow scientific statistical evidence which shows the frequency with which the match might occur in the given population." *Hull,* 687 So. 2d at 728. In *Crawford v. State,* 716 So. 2d 1028 (Miss. 1998), we found that it was "proper" for an expert to present statistical evidence as to the frequency with which a DNA match might occur within the general population. *Crawford,* 716 So. 2d at 1046. Thus, where such evidence is offered in conjunction with evidence of a DNA match made on the basis of either PCR or RFLP analysis, the circuit court should allow its introduction. However, that does not mean that it is an abuse of discretion for the circuit court to allow evidence of DNA matching without also *requiring*statistical analysis of the match. *See Polk v. State,* 612 So. 2d 381, 390 (Miss. 1992) (where trial court allowed evidence of a DNA match but disallowed statistical analysis, this Court found expert testimony regarding DNA match admissible, but did not address admissibility of statistics or trial court's refusal to admit same). Indeed, in *Polk,* it was suggested that evidence that tends to go to the matter of the reliability of DNA testing goes only to the credibility of the evidence offered. *Polk,* 612 So. 2d at 390 n. 2, 393.

¶25. Whether population frequency statistics are really helpful to the jury was discussed recently in *Hepner v. State*, 966 S.W. 2d 153 (Tex. Ct. App. 1998). There, the Texas court addressed the defendant's claim that he was unfairly prejudiced by the defense's introduction of the same statistical data Watts now claims should have been admitted. While the Court found that the probative value of the statistical evidence outweighed its prejudicial value, it noted the testimony of Dr. Jonathan Koehler,[2] which highlighted the relative insignificance of the population statistical data in comparison to laboratory error rates, which usually are not presented to the jury. *Hepner,* 966 S.W. 2d at 157-58.

¶26. Watts appears to want to have his cake and eat it, too, with regard to the DNA statistical evidence; While in Issue III, *infra,* he contends that statistical evidence should have provided along with the DNA evidence taken from his undershorts, he asserts in this assignment of error that statistical evidence regarding DNA samples taken from his jacket should *not* have been admitted. His own expert witness cautioned against extensive reliance upon mixed DNA samples and noted the variety of combinations that could be derived just from the material found on Watts' undershorts. Given that evidence, one would have to question the reliability of any statistical evidence that might be derived therefrom. Indeed, this Court's decision in *Crawford*calls into question the reliability of population frequency statistics to mixed DNA samples without also considering the odds of these two particular individuals' DNA being present on the same item. *Crawford,* 716 So. 2d at 1045 . Further, as the testimony in *Hepner*, as well as in Dr. Koehler's articles, suggests, the introduction of statistical evidence can be meaningless without any evidence of the testing laboratory's error rate. Given that the population statistics, or lack thereof, like evidence of laboratory error rates, go to the credibility of the DNA matching evidence, it cannot be said that the circuit court improperly refused to strike the evidence of the DNA samples found in his undershorts.

### III. WHETHER THE TRIAL COURT ERRED IN ADMITTING PROBABILITY STATISTICS PERTAINING TO THE DNA ON THE DEFENDANT'S JACKET

¶27. After asserting that the circuit court erred in admitting DNA evidence from his undershorts *without* any accompanying statistical data about the mixed sample thereon, Watts now asserts that it was error to admit probability statistics about the DNA evidence on his jacket. He contends that the State failed to show that there are current techniques used to calculate DNA population frequency statistics which are generally accepted by the scientific community and are neither arbitrary nor unreliable. He further asserts that the State failed to show that Dr. Tracey's strict application of the product rule to calculate population frequency statistics was a generally accepted technique in the scientific community. Rather, he urges this Court to require use of the more conservative ceiling principle.

¶28. The significance of a DNA match found between a suspect or a victim and genetic material recovered from the crime scene or other evidence is assessed through a population frequency analysis. That is, what is the likelihood that someone other than the suspect (or the victim) would possess DNA matching that found in the samples taken at the crime scene or from other evidence? As discussed in Issue II, we have found that population frequency statistics are admissible. **Hull,** 687 So. 2d at 728. *See also* **Crawford,** 716 So. 2d at 1045-46.

¶29. The Pennsylvania court, in **Commonwealth v. Blasioli**, 713 A. 2d 1117 (Pa. 1998), presents the most cogent explanation of the product rule, which "states that the probability of a genetic profile occurring randomly is the product of the probabilities of each individual allele's occurrence in the general population." **Id**. at 1124.

> The statistical assessment performed after a match has been declared is called population frequency analysis. The object is to determine the overall likelihood that someone other than the suspect would possess DNA matching that in the sample obtained from the crime scene. The first step is to determine, for each matching allele, the likelihood that such an allele would appear in a randomly selected individual. This determination is made through the application of theoretical models based upon population genetics.

> Such models are generated by creation of a computer database containing DNA profiles obtained from the general population. The frequency of an allele obtained from a sample can be determined by calculating the probability that a matching allele would appear in a DNA sample obtained from an individual who was randomly selected from the database.

> To ameliorate theoretical problems associated with population substructures, discussed below, the Pennsylvania State Police laboratory database categorizes DNA samples according to three racial groups, and uses a process known as "fixed binning." The probability of random matching is also reduced by choosing highly variable segments of the DNA, with dozens of individual alleles, so that individual allele frequency will be very low. Additional variations occur in the matching of the maternal and paternal alleles located at each locus, further reducing the probability of a random match.

> Once the probability of random occurrence is calculated for each individual allele, the individual probabilities may be combined to determine an overall probability of random matching across the genetic profile. In order to make this calculation, scientists have employed the product rule. The product rule states that the probability of two events occurring together is equal to the probability that the first event will occur multiplied by the probability that the second event will occur. Coin tossing is commonly used as an illustration--the probability of a coin flip resulting in "heads" on successive tries is equal to the probability of the first toss yielding heads, fifty percent, times the probability of heads

on the second toss, fifty percent, equaling twenty-five percent.

As applied in DNA typing, the product rule states that the probability of a genetic profile occurring randomly is the product of the probabilities of each individual allele's occurrence in the general population. Such application can produce odds of up to one in 739 billion of a random profile match.

*Id.* at 1122-24 (internal citations and footnotes omitted).

¶30. Watts bases his assault on the product rule on the National Research Council's 1992 Report which, while discussed by the expert witnesses when examined by his attorney, was never entered into evidence. *See* [*Underwood v. State*, 708 So. 2d 18, 26 (Miss. 1998)](this Court decides cases on facts in the record, not assertions in the briefs). As Watts asserts, the 1992 NRC Report recommended the use of the more conservative ceiling principle and the interim ceiling principle. However, he fails to point out that "the NRC's 1992 report did not constitute an outright rejection of the product rule. Instead, the NRC merely recommended that until data could be assembled from which to assess the impact of any significant population substructuring, the ceiling principle could be applied to impose an appropriate degree of conservatism."*Blasioli*, 713 A. 2d at 1125. Since the publication of that report, three subsequent events have all but ended the controversy over use of the product rule. First, in 1993, the FBI conducted a survey of VNTR frequency data and determined that population frequency calculations based on the product rule were "reliable, valid and meaningful, without forensically significant consequences resulting from population substructure as had been postulated by some scientists." *Blasioli*, 713 A. 2d at 1125 (citing Laboratory Division, Federal Bureau of Investigation, United States Department of Justice, 1-A VNTR Population Data: A Worldwide Study 2 (Feb. 1993); *Commonwealth v. Rosier*, 685 N.E. 2d 739 (Mass.1997); *State v. Loftus,* 573 N.W. 2d 167, 174-75 (S.D. 1997); *State v. Copeland*, 922 P.2d 1304 (Wash.1996). Based on the FBI study, Dr. Eric Lander, the leading opponent in the scientific community to use of the product rule declared that the "DNA fingerprinting wars are over" in his article, E. Lander & B. Budlowe, DNA Fingerprinting Dispute Laid to Rest, 371 NATURE 735, 735 (Oct. 27, 1994). *Blasioli,* 713 A. 2d at 1125. Finally, in its 1996 Report, The Evaluation of Forensic DNA Evidence, the NRC noted that "'[t]he ceiling principles were intended for VNTRs with many alleles, no one of which has a very high frequency [and t]hey are not applicable to PCR-based systems.'" *Rosier*, 685 N.E. 2d at 745(*quoting* 1996 NRC Report at 158). The 1996 Report concluded that both the ceiling and the interim ceiling principles were unnecessary and "'[i]n general, the calculation of a profile frequency should be made with the product rule,'" both for VNTR and PCR- based systems. *Id.*(*quoting* 1996 NRC Report at 5).

¶31. Based on these developments, courts which have considered the admissibility of statistical evidence based on the product rule have determined that the challenges to its use have been sufficiently resolved. *Blasioli*, 713 A. 2d 1117; *Loftus*, 573 N.W. 2d at 174; *Rosier*, 685 N.E. 2d at 745; *State v. Copeland*, 922 P.2d 1304 (Wash.1996); *Armstead v. State*, 673 A.2d 221 ( Md. Ct. App.1996); *People v. Edgett*, 560 N.W. 2d 360 (Mich. Ct. App.1996); *People v. Miller*, 670 N.E. 2d 721(Ill. 1996); *State v. Morel,* 676 A.2d 1347 (R.I. 1996); *Lindsey v. People*, 892 P.2d 281, 292 (Colo. 1995); *State v. Dinkins*, 462 S.E. 2d 59 (S.C.1995); *State v. Weeks,* 891 P.2d 477 (Mont. 1995); *Taylor v. State*, 889 P.2d 319 (Okla. Crim. App. 1995); *State v. Anderson*, 881 P.2d 29 (N.M. 1994); *State v. Futrell,* 436 S.E. 2d 884 (N.C. Ct. App. 1993). Given that the product rule has been accepted in the scientific community and found to be a reliable method of calculating population frequency data, we find that the trial court did not abuse its discretion by admitting the evidence.

## IV. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE OF MISSISSIPPI TO MISSTATE THE MEANING OF ITS DNA PROBABILITY STATISTICS

¶32. Watts next asserts that in closing arguments, the prosecution mis-characterized the testimony of statistical expert, Dr. Martin Tracey, and otherwise misled the jury as to the significance of the DNA evidence. No objections were made at trial to the complained of comments and thus, the issue is procedurally barred. *Jackson v. State,* 684 So. 2d 1213, 1226 (Miss. 1996); *Davis v. State,* 660 So. 2d 1228, 1245-46 (Miss. 1995); *Chase v. State*, 645 So. 2d 829, 854 (Miss. 1994).

## V. WHETHER THE TRIAL COURT ERRED IN PERMITTING TWO DISCOVERY VIOLATIONS PERTAINING TO THE PROSECUTION'S DNA PCR EVIDENCE

¶33. Watts further alleges that the State committed two discovery violations in not providing the defense with the requested copies of GenTest's proficiency test results and in introducing testimony by Dr. Tracey which employed product frequency calculations without notice to the defense when he previously had issued a report on the evidence using the ceiling principle, as discussed in Issue III, *supra.*

¶34. On June 28, 1995, the circuit court entered an order directing GenTest Labs to turn over to the defense any and all data relating to any proficiency tests in which the lab had participated, specifically relating to Ampliphite PM testing, DQ Alpha testing, D1S80 testing and STR Triplex testing. Watts apparently did not pursue the matter despite Rule 9.04(I) of the Uniform Circuit and County Court Rules, which provides that when a party has failed to comply with an applicable discovery rule or an order of the court entered pursuant to a discovery rule, the court may then order the party to provide the requested material or grant a continuance or other appropriate relief. Further, since Watts' entire defense is predicated upon his sole witness' attack upon the credibility of the State's DNA evidence, the absence of proficiency test results and/or GenTest's unwillingness to provide the requested information would appear to enure to his benefit. Indeed, rather than raising an objection at trial or seeking a continuance to procure the evidence sought, Watts' expert witness used the absence of proficiency data to his benefit to discredit the reliability of GenTest's testing procedures as well as Dr. Sinha's analysis of the evidence. Watts also has used the evidence, or absence thereof, to attempt to discredit the admissibility of PCR testing. He cannot have it both ways. While the better practice would have been for the State and GenTest to have been forthcoming with the proficiency test data, as recommended by the 1996 NRC II Report,[(3)] Watts was not prejudiced by its absence. This evidence, or lack thereof, goes to the credibility of the witnesses and the evidence they presented; if anything, it served to weaken the State's case.

¶35. Watts also asserts that the prosecution failed to advise him that Dr. Tracey would present statistical evidence based on product rule frequency calculations rather than the ceiling principle used in a report he generated on August 16, 1995. He did not object at trial pursuant to URCCC 9.04(I), and to the contrary, cross-examined Dr. Tracey extensively about the results obtained by using the two different statistical approaches. The issue is procedurally barred by Watts' failure to object at trial. *Wells v. State,* 604 So. 2d 271, 276 (Miss. 1992); *Dodson v. State*, 494 So. 2d 575 (Miss. 1986). As distinguished from *Harrison v. State,* 635 So. 2d 894 (Miss. 1994), upon which Watts relies, where the circuit court erred in overruling the defendant's objections and in refusing to follow his request to comply with former Uniform Criminal Rule of Circuit Court Practice Rule 4.06 and *Box v. State,* 437 So. 2d 19, 22-26 (Miss. 1983), the matter was not put before the court and thus, the circuit court cannot be held in error. *Chase*, 645 So. 2d at 846;

*Jones v. State*, 606 So. 2d 1051, 1058 (Miss. 1992).

### VI. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO COMMENT ON, AND INTRODUCE EVIDENCE PERTAINING TO, DEFENDANT'S FAILURE TO TEST THE DNA EVIDENCE IN THIS CASE

¶36. Watts next contends that the circuit court improperly allowed the prosecution to question his DNA expert, Dr. Ronald Acton, about his failure to run tests on the same evidence tested by GenTest. As the State notes, at the motion in limine hearing, the defense had questioned Dr. Sinha as to whether any material remained available for re-testing. By letter dated January 17, 1996, Ms. Sones notified Dr. Acton that the District Attorney's Office had been advised that the material was available for re-analysis and invited him to contact her to make arrangements if he wanted to run his own tests. On cross-examination, after Dr. Acton testified that his laboratory had been doing forensic PCR testing since October, 1995, Ms. Sones questioned him about whether he had received her letter offering to let him retest the evidence and that he apparently did not seek to have the genetic material retested.

¶37. No objections were raised at trial to the line of questioning, and thus the issue is procedurally barred. *Lester v. State,* 692 So. 2d 755, 773 (Miss. 1997); *Carr v. State*, 655 So. 2d 824, 853 (Miss. 1995) . On re-direct examination, further, the defense did not pursue the issue. Citing no authority, Watts now asserts that the admission of the testimony was improper because the burden was on the State to demonstrate the reliability and general acceptance of the evidence it introduced and that he was not required to offer any evidence or have it tested. This Court is under no obligation to entertain assignments of error unsupported by authority. *Brown v. State,* 690 So. 2d 276, 297 (Miss. 1996); *McClain v. State,* 625 So. 2d 774, 781 (Miss. 1993); *Baine v. State,* 604 So. 2d 249, 255 (Miss. 1992). Procedural bar notwithstanding, there is no merit to the issue. It was Dr. Acton who pointed out that consistent with the NRC guidelines, his was not an unbiased laboratory for re-testing the evidence, but that there were some very good laboratories "that could have been utilized to this and *should have been.*" (emphasis added). The only comment which can be construed as a comment on the defense's "failure" to have the evidence retested came from the defense's own witness, and not from the State.

### VII. WHETHER THE TRIAL COURT ERRED IN PERMITTING THE PROSECUTION TO INTRODUCE HIGHLY PREJUDICIAL MATTERS, INCLUDING THE VICTIM'S FATHER'S SPECULATION THAT DEFENDANT COMMITTED THE OFFENSE AND ALLEGED PRIOR BAD ACTS BY THE DEFENDANT

¶38. Watts next complains that the circuit court erred in allowing the introduction of highly prejudicial evidence at trial. In addition to briefly reasserting his contention that the DNA evidence presented at trial was unreliable and prejudicial, he argues that certain testimony given with regard to the victim's father's belief that Watts should be questioned, as well as testimony given by another witness, Catherine Bullock, was highly prejudicial.

¶39. Watts asserts that he was prejudiced by Officer Carroll Bryant's testimony that Anthony Lumpkin had mentioned to him that Watts should be questioned in the investigation, by Lumpkin's testimony that he, in part, suggested that Watts be questioned because he had stared at the child when she danced "like he was daydreaming or something," and that Lumpkin's credibility was bolstered by testimony of Coroner Norma Williamson that she had known him for fifteen years because they both worked in the health profession. No objections were raised to any of this testimony at trial and thus the issue is procedurally barred from review

by this Court. *Lester,* 692 So. 2d at 773; *Carr*, 655 So. 2d at 853. Further, except to suggest that the complained of testimony was "speculative," Watts makes reference only to several cases where witnesses testified about matters outside their personal knowledge, which are not at all relevant to the complained of testimony. There is no meaningful argument or authority upon which to base any intelligent discussion of the assignment of error and thus it need not be considered by this Court. *Brown,* 690 So. 2d at 297; *McClain,* 625 So. 2d at 781; *Baine,* 604 So. 2d at 255.

¶40. Watts also challenges the testimony of Catherine Bullock, Pauletta Baxter's neighbor. Bullock testified that around 12:00 or 12:30 on the night of the child's disappearance, Watts had been "bamming" on Baxter's door,[(4)] and then came to Bullock's door looking for "Shan." Asked how he was acting, Bullock testified:

> To be honest and tell the truth, in my years I have -- I used to get high off crack cocaine. Twenty-five years old. And this particular night for some reason I didn't get high that night. Squirrel had come up and he bought some drugs and he hung around for a while. Everyone was sitting outside, drinking, popping fireworks. I know I talked to Squirrel.

Watts now mis-characterizes Bullock's testimony, asserting that she was improperly allowed "to testify that she had previously sold drugs to Watts." No contemporaneous objection was raised at trial and thus, the issue is procedurally barred. *Lester,* 692 So. 2d at 773; *Carr*, 655 So. 2d at 853.

### VIII. WHETHER THE JURY VERDICT FINDING DEFENDANT GUILTY OF CAPITAL MURDER WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE AND NO REASONABLE JUROR COULD FIND DEFENDANT GUILTY BEYOND A REASONABLE DOUBT

¶41. Watts next attacks the sufficiency of the evidence, charging that the jury's verdict was against the weight of the evidence and that no reasonable juror could have found him guilty beyond a reasonable doubt. He contends that the DNA PCR evidence, which he considers to be highly suspect, is the State's only evidence against him. He further asserts that there is insufficient evidence to show that he committed sexual battery upon Vanessa Nicole Lumpkin with "lustful intent."

¶42. Any review by this Court of the sufficiency of the evidence upon which the defendant was convicted is made in deference to the verdict returned by the jury. *Kolberg v. State*, 704 So. 2d 1307, 1311 (Miss. 1997). This Court therefore looks at all of the evidence in a light most favorable to the verdict, giving the prosecution the benefit of all favorable inferences that may be drawn therefrom. *Lester,* 692 So. 2d at 797; *McFee v. State*, 511 So. 2d 130, 133-34 (Miss. 1987). The familiar standard is applicable, too, in capital cases. *Mackbee v. State,* 575 So. 2d 16, 36 (Miss. 1990). Furthermore, as explained in *Kolberg*:

> We have held in numerous cases that the jury is the sole judge of the credibility of the witnesses and the weight to be attached to their testimony. We have further said that we will not set aside a guilty verdict, absent other error, unless it is clearly a result of prejudice, bias or fraud, or is manifestly against the weight of credible evidence. *Cromeans v. State,* 261 So. 2d 453 (Miss. 1972); *Marr v. State*, 248 Miss. 281, 159 So. 2d 167 (1963); and *Freeman v. State, supra* [228 Miss. 687, 89 So. 2d 716 (1956)].

*Id.* at 1311(quoting *Maiben v. State*, 405 So. 2d 87, 88 (Miss. 1981)).

¶43. Watts first calls into question the credibility of the DNA evidence presented, briefly attempting to explain away the presence of DNA matching that of the Vanessa Lumpkin on his clothing. He weakly claims that "the victim's DNA on the jacket" is not strong evidence of his guilt, arguing that the age of the bloodstain was unknown and that both he and his former girlfriend, Pauletta Baxter, from whom he had gotten the jacket, knew the victim well. Watts was seen wearing the jacket on the night that the child disappeared. Baxter testified that she had never worn the jacket and had only seen Watts wear it once. His cousin had never seen the jacket before that night. No evidence was presented at trial that the jacket was ever worn in the presence of Vanessa Nicole Lumpkin prior to the night of her death.

¶44. Watts attributes the presence of the mixed DNA samples on the inside of his shorts to contamination, "most probably when Sumrall was collecting it." Sumrall testified that Watts deposited his underwear directly into the bag that Sumrall (who was wearing gloves at the time) was holding. Again, no evidence was introduced at trial to support Watts' hypothesis.

¶45. Watts also suggests that there was insufficient evidence to convince a reasonable juror that a sexual battery had occurred because there was no evidence of lustful intent. However, lustful intent is not an element of sexual battery that needs to be proven. Rather, Miss. Code Ann. § 97-3-95(1)(c)(1994) requires only a showing of sexual penetration with a child under the age of fourteen. Vanessa Nicole Lumpkin was ten years old. Dr. Ward testified that the child sustained severe bruising in the perineal area and a tear in the vaginal wall. While she was unable to determine whether the injuries were caused by a penis or some other object, penetration clearly occurred. Looking at the evidence of the nature and extent of the injuries sustained by the victim in a light most favorable to the verdict, there is more than sufficient credible evidence to sustain the jury's findings.

### IX. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN PERMITTING THE PROSECUTION AND DEFENSE COUNSEL TO WAIVE RACE AND GENDER OBJECTIONS DURING VOIR DIRE

¶46. Watts' first trial ended in a mistrial after a jury could not be seated. At the second trial, after voir dire was completed, the circuit court asked the parties how they wished to proceed with regard to peremptory challenges pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). The following exchange took place:

THE COURT: Now, let's see. On the jurors what is going to be the defense and the State's position as to *Batson*?

MR. BROADHEAD: Your Honor, at this time we would waive *Batson.* Cocounsel and I, Mr. Sweatt, have talked in detail about this between ourselves first and then with Mr. Watts. And with the experience of last time trying to pick a jury and not -- the defense was put in a spot in a couple of instances with jurors where we wanted them off the jury, but were unable to state race neutral or gender-neutral reasons. And because of that experience we do intend to waive *Batson* at this time.

THE COURT: What about the State?

MR. DOUGLASS: Well, we would invoke *Batson* if the defense did. And since they did not want to, then we will not invoke.

¶47. Watts now charges that the circuit court "willingly and intentionally permitted the prosecution and defense to engage in race-based and gender-based jury selection." It is clear from the record, however, that

it was the defense's idea to "waive **Batson**" to avoid having to come up with gender- or race-neutral reasons for peremptory challenges. The State agrees with Watts' assertion that the circuit court should not have allowed the parties to waive **Batson.** However, it suggests that Watts "intentionally waived **Batson** objections in order to discriminate" and that but for Watts' request to waive **Batson,** no waiver would have occurred. Moreover, the State questions the propriety of Watts now challenging an error that he, himself, invited for his own benefit.

¶48. In *Mata v. Johnson,* 99 F.3d 1261 (5th Cir.1996), vacated in part on other grounds, 105 F.3d 209 (1997), the Fifth Circuit addressed a similar agreement made to impact jury selection and declared that despite the fourteenth amendment violation that resulted, a new trial was not warranted because of the defendant's willing participation in the agreement. Mata, who is Hispanic, was convicted of killing a black prison guard at the Texas Department of Corrections facility where he was an inmate. At trial in 1986, counsel for the defense and the prosecution expressly agreed to exclude all eight black members of the venire panel. *Mata,* 99 F.3d at 1268. The trial judge effectively approved the agreement by allowing the parties to strike each black without stating any reason or exercising any of their peremptory challenges. *Id.*

¶49. The Fifth Circuit noted the various concerns raised by the parties, who, as in the case *sub judice,* raised the issues of public confidence in the jury system and violation of jurors' rights, but refused to adopt a per se rule reversing a case whenever individuals have been excluded from a jury because of race. *Id.* at 1270. Instead, considering Mata's willing participation in the constitutional violation, the court denied his claim for a new trial on that ground. *Id.* at 1270-71. Similarly, in the case *sub judice*, we find that a new trial is not warranted on the basis of the **Batson** issue since it was waived by the defendant.

### X. WHETHER THE TRIAL COURT ERRED IN GIVING THE APPEARANCE OF BIAS IN FAVOR OF THE PROSECUTION, PARTICULARLY DURING THE DIRECT EXAMINATION OF DR. EMILY WARD

¶50. Watts next asserts that the circuit court improperly assisted the prosecution in the presentation of its case, giving the impression of bias in its favor, particularly during the direct examination of State Medical Examiner, Dr. Emily Ward, who conducted the autopsy on Vanessa Nicole Lumpkin. He relies exclusively on *West v. State*, 519 So. 2d 418 (Miss. 1988), where this Court warned judges to limit their involvement in trial proceedings, stating:

In *Thompson v. State*, 468 So. 2d 852, 854 (Miss. 1985), the Court said:

It is a matter of common knowledge that jurors . . . are very susceptible to the influence of the judge . . . jurors watch his conduct, and give attention to his language, that they may, if possible, ascertain his leaning to one side or the other, which, if known, often largely influences their verdict. He cannot be too careful and guarded in language and conduct in the presence of the jury, to avoid prejudice to either party.

*See also Norman v. State*, 385 So. 2d 1298 (Miss. 1980); *Stallworth v. State*, 310 So. 2d 900 (Miss. 1975); *Shore v. State*, 287 So. 2d 766 (Miss. 1974); *Green v. State*, 97 Miss. 834, 53 So. 415 (1910).

We have recognized the danger that a trial judge generates by indicating or showing his attention to certain matters in the trial which may communicate to the jury the impression that such evidence or

testimony is important or unimportant, and the very position of a judge during trial makes each comment unusually susceptible of influencing a juror or the jury. *Shelton v. Puckett*, 483 So. 2d 354 (Miss. 1986); *Hannah v. State,* 336 So. 2d 1317 (Miss. 1976); *Thompson v. State, supra; Stubbs v. State*, 441 So. 2d 1386 (Miss. 1983); *Fulgham v. State*, 386 So. 2d 1099 (Miss. 1980); *Myers v. State*, 99 Miss. 263, 54 So. 849 (1911).

*West,* 519 So. 2d at 422-23. Thus, in *West*, where the circuit court expressly coached the district attorney in a stated effort to avoid reversible error and asked questions of the witnesses where it felt the prosecution had not elicited satisfactory answers, this Court found thirty instances where the lower court judge had improperly interjected himself, including the asking of questions which served to strengthen the case against the defendant, and reversed the case for a new trial. *Id.* at 421.

¶51. Watts did not raise any contemporaneous objections[(5)] to the comments he now assigns as error and thus, the issue is procedurally barred. *Walker v. State*, 671 So. 2d 581, 597 (Miss. 1995); *Foster v. State*, 639 So. 2d 1263, 1270 (Miss. 1994). Furthermore, no judicial overreaching is present in the case *sub judice.* Our review of the eight instances complained of persuades us that the circuit court did not impermissibly "assist the prosecution" as Watts argues, or in the manner found improper in *West*. Moreover, we cannot help but notice that the circuit court "assisted" the defense from time to time, particularly during the direct examination of Dr. Sudhir K. Sinha, Director of GenTest, Inc. Any "assistance" provided by the circuit court to the attorneys in presenting their cases was even-handed, to say the least.

## XI. WHETHER THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS

¶52. On June 6, 1995, Watts filed a Motion to Suppress evidence that he alleged was seized illegally from him. He contended that the clothing he was wearing at the time of his arrest on December 20, 1993 was seized neither pursuant to a lawful warrant nor through normal Sheriff's Office custodial procedures and asserted that DNA evidence taken from those items should be suppressed. Watts now asserts that his underwear and clothing were the fruits of an unlawful seizure because the police lacked probable cause to detain him. While acknowledging that he executed two separate waivers of his rights, Watts relies on a plurality opinion in *Florida v. Royer,* 460 U.S. 491, 501 (1983), to support his contention that the taint of any prior illegality such as an illegal search or seizure generally is sufficient to invalidate consent. However, there was no illegal search or seizure in the case *sub judice*. Rather, the police had sufficient grounds for questioning and detaining Watts and he had been advised of his rights, consulted with an attorney and twice given his consent before turning his clothing over to the authorities. Further, in *Shell v. State,* 554 So. 2d 887 (Miss. 1989), *rev'd on other grounds,* 498 U.S. 1 (1990), this Court stated that "[i]t is a long-standing rule in this, and other jurisdictions that, pursuant to a lawful arrest, law enforcement officials may seize personal effects and clothing from one who has been arrested." *Shell,* 554 So. 2d at 896. *See also Brown v. State*, 690 So. 2d 276, 285 (Miss. 1996)(circuit court did not err in refusing to suppress evidence of shoes and coat taken from plain view at defendant's house taken at the time of his arrest); *Upshaw v. Sta te*, 350 So. 2d 1358 (Miss.1977)(seizure of defendant's clothing upon his arrival at jail not a violation of his constitutional rights). There being no basis in the evidence for Watts' claim that he was unlawfully detained or arrested or that the Sheriff's Department did not follow its normal custody procedures in collecting his clothing, we do not hold the circuit court in error for refusing to suppress the items and any evidence taken therefrom.

## XII. WHETHER THE PROSECUTOR IN THIS CASE ENGAGED IN MISCONDUCT THAT REQUIRES REVERSAL

¶53. Watts next raises four instances of alleged prosecutorial misconduct arising from comments made during the closing arguments of both the guilt and sentencing phases of his trial. He contends that the cumulative effect of these comments warrants reversal of his case. Watts made no objection to the comments at trial and the issue of prosecutorial misconduct was not raised in his motion for a new trial. Despite his assertion that prosecutorial misconduct *must* be reviewed on appeal despite counsel's failure to object,[(6)] the assignment of error is procedurally barred. *Jackson,* 684 So. 2d at 1226; *Chase*, 645 So. 2d at 854. As this Court explained in *Jackson,* where it was alleged that the prosecutor made improper comments during both opening and closing arguments as well as while examining witnesses, but no objections were raised at trial, "'[t]he defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal.'" *Id*. at 1226 (*quoting Foster v. State,* 639 So. 2d 1263, 1289 (Miss. 1994)). Moreover, the contemporaneous objection rule remains applicable in capital murder cases. *Evans v. State,* Nos. 93-DP-01173-SCT, 94-CA-00176-SCT 1997 WL 562044 (Miss. Sept. 11, 1997); *Williams v. State,* 684 So. 2d 1179, 1203 (Miss. 1996).

## XIII. WHETHER THE TRIAL COURT ERRED IN ALLOWING NORMA WILLIAMSON, A CORONER, TO TESTIFY TO MATTERS ABOUT WHICH SHE HAD NO EXPERTISE

¶54. Watts next asserts that the circuit court erred in allowing testimony by Marion County Coroner, Norma Williamson, that marks on the victim's neck and arms appeared to be ligature marks, that the child appeared to have been sexually abused because of the position of the body and drainage coming from the vagina, that there was no way to tell which came first- the alleged strangulation or the air embolism and that the sexual assault could have come after the victim's death. While Watts contends that admission of the evidence violated a panoply of rules of the Mississippi Rules of Evidence as well as the eighth and fourteen amendments to the United States Constitution and corresponding provisions of the Mississippi Constitution, he asserts only that Williamson testified about expert matters that "were clearly outside any expertise she might have had" without any meaningful argument or authority to support the assignment of error. His argument, therefore, need not be addressed by the Court. *Brown,* 690 So. 2d at 297; *McClain,* 625 So. 2d at 781; *Baine,* 604 So. 2d at 255.

¶55. Watts' arguments further are procedurally barred by his failure to raise any objection at trial to Williamson's testimony on direct examination, to which Watts cites, about her opinion regarding the ligature marks and evidence that the child had been sexually assaulted. *Lester,* 692 So. 2d at 773; *Carr*, 655 So. 2d at 853. Moreover, the testimony to which Watts refers regarding what occurred first, strangulation or the air embolism, and whether the child was sexually assaulted before or after death, was in response to questions posed on cross-examination by the defendant's own attorney! The only objection raised was by the State, which questioned whether Williamson, a nurse, was qualified to answer Watts' attorney's question as to whether the child might already have been dead when she was sexually assaulted. The circuit court sustained the State's objection, allowing Williamson, who was offered not as an expert but as fact witness as to what she saw and did at the crime scene, to testify only as to whether she was, indeed, qualified to render an opinion. Despite her response that it would take a medical doctor to make such an assessment, the defense pursued the line of questioning without any further objections from the State.

## XIV. WHETHER THE TRIAL COURT ERRED IN ADMITTING NUMEROUS GRUESOME PHOTOGRAPHS AND A NUMBER OF AUTOPSY PHOTOGRAPHS

¶56. Watts next asserts that the circuit court erred in denying his motion to suppress inflammatory photographs and admitting into evidence photographs of the victim, including autopsy pictures, some of which were enlarged from a standard 6" x 8" size to 20" x 30". While he makes specific allegations only about the inflammatory nature of a picture of "the dead child lying crammed into the fork of a tree root on a creek bank" and the gruesomeness of the autopsy pictures, Watts appears to argue that the trial court erred in overruling his objections to photographs of the victim's body, her wrist, her left arm, her upper body, and autopsy pictures of her throat and heart. The circuit court passed on Watts' objections to photographs of the child's genital area until trial, where the exhibit in question was allowed into evidence.

¶57. "[T]he admissibility of photographs rests within the sound discretion of the trial judge, whose decision will be upheld absent abuse of that discretion . . . Yet, photographs which are gruesome or inflammatory and lack an evidentiary purpose are always inadmissible as evidence." *McFee v. State*, 511 So. 2d 130, 134 (Miss. 1987). In light of *McFee* and M.R.E. 403,[(7)] a court, when considering admissibility, must also consider (1) whether the proof is absolute or in doubt as to identity of the guilty party, and (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury. *McNeal v. State*, 551 So. 2d 151, 159 (Miss. 1989)(finding that gruesome photographs of a maggot-infested body were devoid of any evidentiary purpose). *See also* *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987) ("[G]enerally the admissibility of [photos] is within the sound discretion of the trial judge and the admission is proper, so long as their introduction serves some useful evidentiary purpose. . . . Abuse of discretion is sometimes explained to be admission of [photos] when a killing is not contradicted or denied or the corpus delicti and the identity of the deceased have been established.").

¶58. While there is nothing pleasant about these pictures, they are neither gruesome nor inflammatory, nor are they overdramatized by their enlargement; Absent enlargement, much of the relevant detail would not be easily discernible. All of the photographs complained of have significant evidentiary value, whose probative value was increased by enlargement. The circuit court did not abuse his discretion in admitting any of the pictures.

## XV. WHETHER THE STATE OF MISSISSIPPI VIOLATED WATTS' CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL

¶59. Watts next contends that his constitutional and statutory rights to a speedy trial were violated by the 959 days that elapsed between the time he was taken into custody and the date of his trial. He does not seriously argue the issue, presenting no facts or even the vaguest attempt at a meaningful discussion; rather, he merely directs the Court to see *Barker v. Wingo*, 407 U.S. 514 (1972) and to vacate his conviction and sentence, citing *Trotter v. State*, 554 So. 2d 313, 319 (Miss. 1989).

¶60. The circuit court made a detailed on-the-record finding regarding pre-trial delays in the case before hearing peremptory challenges, explaining as follows:

THE COURT: Let the record show that James Earnest Watts on June the 13th, 1994, waived arraignment and waived speedy trial, waived 270 days. And a psychiatric/psychological exam was ordered. And then at the next term of court on August the 25th, 1994, James Watts waived

arraignment, waived speedy trial, waived 270 days and requested a continuance and the cause was continued till the October 1994 term. And on October the 10th, the cause was continued at the defendant's request and preset for May the 22nd, 1995. And at the same time he waived speedy trial rights and waived 270 days. And then on March the 17th, 1995, the defendant's motion for change of venue was granted and the venue was changed to Lincoln County. And the trial was then moved to May the 21st, 1995 -- no. Excuse me. The trial of May the 21st, 1995, was continued by agreement of both the State and the defense. And at that time the case was preset for August the 29th, 1995, in Lincoln County. And then on August 29th, 1995, in Lincoln County the defendant was arraigned, entered a plea of not guilty. At that time after voir dire of the jury was completed the jury panel was exhausted without a jury being able to be selected. So at that time a mistrial was declared and the case was continued till the February 1996 term of court in Marion County with venue still being changed to Lincoln County. Then on February 26th, 1996, the trial was set again in Lincoln County for March the 4th, 1996. And at that time on motion by the defense because of the methodology that the jury box was loaded the venire was quashed and a mistrial was declared. And the case was reset for trial on June the 24th, 1996, in Lincoln County. Then on March the 8th, 1996, at both parties' request the case was reset for June the 24th, 1996, for today being August the 5th, 1996. And that is the chronological events that have transpired in this case to date. Okay.

MS. SONES: Judge, just I'd like to add one thing about that very last thing. The reason that trial date was moved was because one of the experts for the defense could not be there and we had no objection to moving it.

THE COURT: Well, it was by agreement of both sides, but whatever the reasons were . . .

¶61. The right to a speedy trial is guaranteed by the sixth and fourteenth amendments to the United States Constitution and art. 3, § 26 of the Mississippi Constitution of 1890. "The constitutional right to a speedy trial attaches at the time a person is effectively accused of a crime." *Skaggs v. State,* 676 So. 2d 897, 900 (Miss. 1996); *Noe v. State,* 616 So. 2d 298, 300 (Miss. 1993). An alleged violation of that right is subject to scrutiny under the four-prong analysis set out by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514 (1972). The *Barker* factors include 1) the length of the delay, 2) the reason for delay, 3) the defendant's assertion of his right to a speedy trial and 4) prejudice to the defendant by the delay. *Id.* at 530. No single factor is dispositive. *Skaggs,* 676 So. 2d at 900. Rather, this Court looks at the totality of the circumstances in determining whether a defendant's rights have been violated. *Herring v. State,* 691 So. 2d 948, 955 (Miss. 1997).

¶62. When, as in the case *sub judice,* the length of delay is presumptively prejudicial, "'the burden shifts to the prosecutor to produce evidence justifying the delay and to persuade the trier of fact of the legitimacy of the reasons.'" *Herring,* 691 So. 2d at 955-56 (*quoting* **State v. Ferguson,** 576 So. 2d 1252, 1254 (Miss. 1991)). Watts was granted a total of four continuances. In each of his first three motions for continuances, Watts expressly waived speedy trial rights. His first continuance was granted on June 13, 1994, in conjunction with a motion for a psychiatric examination and evaluation. Watts' second motion for a continuance was granted on October 18, 1994, setting his case for trial on May 22, 1995. At the same time, the circuit court also granted his motions to provide funds for expert witness assistance and a private investigator. Watts' third motion for a continuance was granted on May 29, 1995, because of the unavailability of his DNA statistical expert and the illness of State Medical Examiner, Dr. Emily Ward. The trial was reset for August 29, 1995. "Continuances that are attributed to the defendant stop the running of

the clock and are deducted from the total number of days before trial." *Herring,* 691 So. 2d at 953; *Vickery v. State*, 535 So. 2d 1371, 1375 (Miss. 1988). These three continuances clearly were attributable to Watts.

¶63. A mistrial was declared in this case on August 29, 1995, when the venire panel was exhausted before a jury was selected. Where a mistrial has been declared, the *Barker* factors are utilized to determine whether the discretionary time between trials violated the defendant's right to a speedy trial. *Handley v. State,* 574 So. 2d 671, 674 (Miss. 1990). Trial was reset for March 4, 1996, a little over six months from the time of the first trial.

¶64. Watts' fourth order granting a continuance, arising from his *ore tenus* motion to quash the venire panel, was entered on March 15, 1996. The circuit court found that on February 9, 1996, it was discovered that a problem existed with the venire pool because of improper instructions given to the Lincoln County Circuit Clerk by the Delta Computer Company. In its written order, the circuit court expressly ruled that the delay in the proceedings was not chargeable to either party for purposes of the speedy trial rule. Trial, originally re-slated for June 24, 1996, was reset at Watts' request for August 5, 1996, because of a scheduling conflict with his DNA expert.

¶65. The delay prior to the first trial weighs heavily against Watts, since it is attributable to the first three continuances he sought. Because just a little over six months elapsed between the first trial and the scheduled date of the second trial, there is no presumption of prejudice. As the trial court found, Watts' fourth motion for a continuance was not chargeable to him or the State because the computer glitch that necessitated the delay was not the fault of either party. While the delay between the original June 24, 1996 trial date and the August 5, 1996 date for which it was rescheduled was made to accommodate Watts' expert witness, the record indicates that both parties agreed to the change. It should not be weighed against either.

¶66. While an accused is under no duty to bring himself to trial, "'he gains far more points under this prong of the *Barker* test where he has demanded a speedy trial.'" *Perry v. State,* 637 So. 2d 871, 875 (Miss. 1994)(*quoting Jaco v. State,* 574 So. 2d 625, 632 (Miss. 1990)). There is no evidence in the record that Watts made any attempt to expedite the proceedings against him. To the contrary, he repeatedly waived his right to a speedy trial in each of his first three motions for continuances. We further note that Watts does not even assert that he was prejudiced in any way by the delay in his trial; he contends only that his rights were violated. The record does not indicate at what point the defendant was incarcerated, and he makes no reference to any particular anxiety or concern he suffered.

¶67. In *Rhymes v. State,* 638 So. 2d 1270 (Miss. 1994), we found that "[w]here, as here, the delay is neither intentional nor egregiously protracted, and where there is a complete absence of actual prejudice, the balance is struck in favor of rejecting Rhymes' speedy trial claim." *Id.* at 1275. *See also Stogner v. State,* 627 So. 2d 815 (Miss. 1993)(in absence of assertion of rights and any showing of material prejudice, twenty-five month delay did not violate right to speedy trial). Given that the delays in Watts' trial were not attributable to the State, but to the defendant's first three motions for continuances, that Watts made no effort to assert his rights prior to trial and that he has not alleged any prejudice, it cannot be said that his constitutional right to a speedy trial was violated.

## XVI. WHETHER THE TRIAL COURT IMPROPERLY INSTRUCTED THE JURY IN NUMEROUS WAYS

¶68. Watts next complains that the circuit court's instructions to the jury during both the guilt and sentencing phases of his trial were constitutionally deficient. The assignments of error are barred because of Watts' failure to object to the complained of instructions at trial or even raise them in his motion for a new trial. *Berry v. State*, 703 So. 2d 269, 277 (Miss. 1997). Moreover, he fails to cite any authority or provide any meaningful argument in support of most of the objections he now raises to many of the instructions. *Brown,* 690 So. 2d at 297; *McClain,* 625 So. 2d at 781; *Baine,* 604 So. 2d at 255.

¶69. Procedural bar notwithstanding, Sentencing Instruction No. 2 erroneously instructed the jury that it had only two sentencing options: life in prison or the death penalty. A third option, life imprisonment without the possibility of parole, should have been presented pursuant to Miss. Code Ann. §§ 97-3-21 and 99-19-101. Watts, therefore, is entitled to re-sentencing proceedings.

¶70. Miss. Code Ann. § 97-3-21(1994) provides that

> Every person who shall be convicted of capital murder shall be sentenced (a) to death; (b) to imprisonment for life in the State Penitentiary without parole; or (c) to imprisonment for life in the State Penitentiary with eligibility for parole as provided in Section 47-7-3(1)(f).

Prior to trial, the parties' attorneys discussed with the circuit court the various sentencing alternatives available under the revised statute. Finding that Watts had only two sentencing options available to him, the circuit court stated:

> Well, my position would be when we instruct the jury that since this occurred prior to the statute being enacted that gives the jury the right to impose life without parole that we will not put the ["]without parole["] in the possible verdict, because that was enacted after this crime was committed.

> * * * * * *

> The jury will just strictly be instructed in the penalty phase, if we get to that, that they only have two options. And that is life imprisonment in the custody of the Mississippi Department of Corrections or the death penalty. And parole will not be a factor in their determination.

¶71. Like the circuit court, the State contends that the law is not applicable to Watts because the crime for which he was convicted was committed on December 19 or 20, 1993, before the law was enacted. However, Chapter 566, section 5 of the Laws of Mississippi, 1994, refutes that assertion, providing expressly that "[t]he provisions of this act shall apply to any case in which pre-trial, trial or resentencing proceedings take place after July 1, 1994." Watts' trial was held on August 5, 1996, more than two years after the effective date of the statute. That the offense with which he was charged occurred before the July 1, 1994 date is immaterial. The circuit court committed reversible error in finding that Watts was not eligible for presentation to the jury of the option of a sentence of life in prison without parole, pursuant to the terms of § 97-3-21. *West v. State,* No. 94-DP-01200-SCT, Slip op. at 15 (Miss. August 11, 1998).

¶72. Because the case must be reversed for re-sentencing proceedings, we also note that Watts contends that circuit court erred in refusing to grant his Sentencing Instruction No. D-10, which provided as follows:

> The Court instructs the jury that there are two possible punishments at this phase of the trial, death and life imprisonment. Your sentence of death means that you have ordered that James Earnest Watts

be executed by lethal injection; Your sentence of life imprisonment means that you have sentenced Mr. Watts to spend eighty-five (85%) percent of his natural life in prison.

The instruction is an incorrect statement of the law. It therefore was properly refused. *Chase,* 645 So. 2d at 861. It improperly states that there were two only options for sentencing Watts. Moreover, it incorrectly articulates the possibility of parole. *See Puckett v. Abels*, 684 So. 2d 671, 678 (Miss. 1996)(finding that Senate Bill 2175, as applied to the possibility of parole of offenders who were sentenced on or after July 1, 1995 but committed crimes before July 1, 1995, was an improper *ex post facto* law). Accordingly, the circuit court correctly refused to grant the instruction.

¶73. We further note that Sentencing Instruction No 5, despite Watts' contention to the contrary, passes constitutional muster. Sentencing Instruction No. 5 reads as follows:

> The court instructs the jury that in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of, the suffering of others.

> An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of murders -- the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence beyond a reasonable doubt that the defendant James Earnest Watts A/K/A "Squirrel," utilized a method of killing which caused serious physical or mental pain on the body of Vanessa Nicole Lumpkin before her death, or that a lingering or torturous death was suffered by Vanessa Nicole Lumpkin at the hands of James Earnest Watts A/K/A "Squirrel," then you may find this aggravating circumstance.

The language used in the second paragraph of the instruction, which describes an especially heinous, atrocious or cruel murder as one which is "accompanied by such additional acts as to set the crime apart from the norm of murders -- the conscienceless or pitiless crime which is unnecessarily torturous to the victim," has been found to provide a proper limit on the language condemned in *Shell v. Mississippi*, 498 U.S. 1 (1990). *Clemons v. Mississippi*, 494 U.S. 738 (1990). This Court, too, has found the language of the instruction about which Watts complains to be constitutional. *Holland v. State,* 705 So. 2d 307, 356 (Miss. 1997); *Evans v. State,* Nos. 93-DP-01173-SCT, 94-CA-00176-SCT 1997 WL 562044 (Miss. Sept. 11, 1997); *Lester v. State,* 692 So. 2d 755, 797-98 (Miss. 1997); *Wilcher v. State*, 697 So. 2d 1087, 1109-10 (Miss. 1997); *Brown v. State*, 690 So. 2d 276, 294-95 (Miss. 1996).

¶74. In *Hansen v. State*, 592 So. 2d 114 (Miss. 1991), this Court found that when considering whether a crime could be considered "especially heinous, atrocious or cruel,"

> barbarity sufficient to satisfy this aggravating circumstance can be demonstrated by showing that the defendant utilized a method of killing which caused serious mutilation, where there is a dismemberment of the corpse, where the defendant inflicted physical or mental pain before death, or where a lingering or torturous death was suffered by the victim.

*Id.* at 152 (*quoting Pinkney v. State*, 538 So. 2d 329, 357 (Miss. 1988), *vacated on other grounds,* 494 U.S. 1075 (1990)). Although this aspect of *Pinkney* was not addressed in the United States Supreme Court's review of the case, similar limiting language to that used in Sentencing Instruction No. 5 was

approved in ***Lewis v. Jeffers***, 497 U.S. 764 (1990) and ***Walton v. Arizona,*** 497 U.S. 639 (1990). *See also **Jackson,*** 684 So. 2d at 1236-37; ***Conner v. State***; 632 So. 2d 1239, 1270 (Miss. 1993); ***Jenkins v. State,*** 607 So. 2d 1171 (Miss. 1992). The language in Sentencing Instruction No. 5 has sufficiently "refined and narrowed the aggravating circumstance of 'heinous, atrocious or cruel' and channeled in a principled way the jury's sentencing discretion, excluding the arbitrary and the capricious to the extent reasonably practicable and has fairly facilitated proportionality review." ***Hansen***, 592 So. 2d at 152.

¶75. There further is no merit to Watts' charge that Sentencing Instruction No. 4 improperly instructed the jury that the number of aggravating and mitigating factors is "wholly immaterial" to the sentencing decision. Sentencing Instruction No. 4 provides:

> The Court instructs the jury that in [the] weighing of mitigating and aggravating circumstances the number of each is wholly immaterial and must not be so considered by you, but instead, that you must consider the same in terms of their individual importance and effect upon your minds as jurors. That is to say, by way of example, that one of either of such circumstances, standing alone, may, if it satisfies your minds as jurors, outweigh all multiple other circumstances.

Watts concedes that Sentencing Instruction No. 3, submitted by the State, is a "far more accurate statement of the law." That instruction provided as follows:

> The Court instructs the jury that it must be emphasized that the procedure you must follow is not a mere counting process of a certain number of aggravating circumstances versus the number of mitigating circumstances. Rather, you must apply your reasoned judgment as to whether this situation calls for life imprisonment or whether it requires the imposition of death, in light of the totality of the circumstances present.

This Court considers whether the instructions given to the jury, read as a whole, fairly announce the law of the case. ***Coleman v. State,*** 697 So. 2d 777, 782 (Miss. 1997). Read together, the instructions fairly advise the jury that the consideration of aggravating and mitigating factors is not a mere numbers game. ***Lester,*** 692 So. 2d at 800-01.

¶76. Watts further complains that his eighth amendment rights were violated by use of the term "sentiment" in Sentencing Instruction No. 2 as well as by the language, "You should consider and weigh any mitigating circumstances as set forth later in this instruction, but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." He does not elaborate. We have found that the language given in the instruction is acceptable. ***Blue,*** 674 So. 2d at 1225; ***Willie v. State***, 585 So. 2d 660, 677 (Miss. 1991).

¶77. Finally, Watts contends that the "catch-all mitigating factor" language in Sentencing Instruction No. 2 could be construed by reasonable jurors "to mean that they had discretion under the law to decide not to consider non-statutory mitigating circumstances when deciding defendant's sentence." The complained of language reads:

> 7. Any matter, any other aspect of the defendant's character or record, and any other circumstance of the circumstance brought you during the trial of this cause, which you, the Jury deem to be mitigating on behalf of the defendant;

This is a proper "catch-all" instruction and as such does not foreclose the jury from considering any and all

mitigating factors. *Berry,* 703 So. 2d at 287; *Lester,* 692 So. 2d at 799; *Gray v. State*, 375 So. 2d 994, 1003-04 (Miss. 1979). *See also Blystone v. Pennsylvania*, 494 U.S. 299 (1990)(catch-all instruction did not unconstitutionally limit jury's consideration of mitigating factors). There is no merit to Watts' assertion that the instruction instructs the jury to ignore non-statutory mitigating factors; rather it allows the jurors to consider other mitigating evidence. *Evans,* 1997 WL 562044, at *85.

### XVII. WHETHER, AT LEAST PRIOR TO AUGUST, 1994, MISS. CODE ANN. § 97-3-19(2)(e) VIOLATED THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES; AND ART. 3, SECS. 14, 26 AND 28 OF THE MISSISSIPPI CONSTITUTION, AS WELL AS MISSISSIPPI CASE LAW

¶78. Watts next asserts that because the elements of the capital murder pursuant to Miss. Code Ann. § 97-3-19(2)(e) were the same as those set out in Miss. Code Ann. §97-3-27 for manslaughter at the time of the crime for which he was convicted, his conviction and sentence under the harsher statute violated a panoply of constitutional rights. He variously argues that the existence of two separate statutes under which charges may be brought fails to furnish a principled means of distinguishing those defendants charged with committing sexual battery who are eligible for the death penalty; that the rule of lenity forbids conviction on the greater offense; and that the remedial amendments to Miss. Code Ann. § 97-3-27 are not retroactively applicable to his case. Watts failed to raise the issue in the proceedings below. Further, we squarely rejected the exact arguments he now raises in *Lester v. State*, 692 So. 2d 755, 788 (Miss. 1997). *See also Jackson,* 684 So. 2d at 1229 (overlap between §§ 97-3-19(2)(f) and 97-3-27 does not give prosecutors and juries unfettered discretion in imposing death penalty). Watts further contends that the rule of lenity dictates that where two penal statutes set forth identical elements of the offenses, the accused must be prosecuted under the statute imposing the lesser punishment. *See Dunn v. United States*, 442 U.S. 100, 112 (1979) ("[The rule of lenity] reflects not merely a convenient maxim of statutory construction. Rather, it is rooted in fundamental principles of due process."); *Mullaney v. Wilbur*, 421 U.S. 684, 703-04 (1975) ("[It] is far worse to sentence one guilty only of manslaughter as a murderer than to sentence a murderer for the lesser crime of manslaughter."). In *Blue,* the same argument was made when this issue was raised on appeal despite counsel's failure to raise it at trial. Having rejected the merits of the constitutional issue, this Court imposed the procedural bar "without hesitation." *Blue,* 674 So. 2d at 1206; *Chase*, 645 So. 2d at 835; *Foster,* 639 So. 2d at 1270. There is no merit, therefore, to the argument Watts now makes.

### XVIII. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S SENTENCING INSTRUCTIONS NOS. 7, 8 AND 9

¶79. Watts next complains that the circuit court erred in denying his Sentencing Instructions Nos. 7, 8 and 9. The State correctly asserts that the requested instructions were not warranted.

¶80. He first contends that he should have been allowed to instruct the jury to presume there were no aggravating factors and that it could consider only those aggravating circumstances set out in the court's preliminary sentencing instruction. Sentencing Instruction No. D-7 provides as follows:

> The Court instructs the jury that you are to presume that there are no aggravating circumstances that would warrant a sentence of death. That presumption may be abandoned if and only if the evidence convinces you beyond a reasonable doubt that one or more of the particular specified aggravating circumstances exist.

The Court further instructs the jury that I have previously read to you the list of aggravating circumstances which the law permits you to consider if you find that any of them are established by the evidence. These are the only aggravating circumstances you may consider.

The jury was properly instructed that it could consider only those aggravating factors presented by the court which it found to exist beyond a reasonable doubt as part of the Court's Sentencing Instruction No. 2. We have held that a separate instruction regarding the presumption of no aggravating circumstances is not required. *Davis v. State,* 660 So. 2d 1228, 1245 (Miss. 1995).

¶81. Watts further contends that the circuit court should have allowed his Sentencing Instruction D-8, instructing the jury on the "presumption of life imprisonment." The refused instruction stated:

The Court instructs the jury that James Earnest Watts enters this phase of the trial with the presumption that there are no aggravating circumstances that would warrant a sentence of death, and the presumption that the appropriate punishment in his case would be life imprisonment. These presumptions remain with James Earnest Watts throughout the sentencing hearing, and can only be overcome if the evidence convinces each one of you, beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis consistent with the innocence of the defendant, that death is the only appropriate punishment.

Finding no error in the denial of a similar instruction in *Jackson v. State*, 684 So. 2d 1213 (Miss. 1996), we noted that we had already flatly rejected the proposition that "'a defendant should go into the sentencing phase with a presumption that life is the appropriate punishment.'" *Id*. at 1233 (*quoting Chase*, 645 So. 2d at 860). *See also Leatherwood v. State,* 435 So. 2d 645, 650 (Miss. 1983)(if the defendant "had not been convicted of a capital offense, there would be no need for the sentencing hearing and he would simply be sentenced to serve a life term. This does not mean though that the procedure is unfair or faulty.").

¶82. Watts also asserts that he was entitled to a mercy instruction under Mississippi law and the eighth and fourteenth amendments to the United States Constitution, but does not elaborate. Thus, he claims, Sentencing Instruction No. D-9, which provides as follows, should have been allowed:

The Court instructs the jury that although at the guilt and innocence phase of the trial, you were instructed that you were not to be swayed by sympathy, at this phase of the trial you are bound by law and your oath as jurors to consider mitigating factors. Mitigating factors are facts that, while they do not justify or excuse the crime, nevertheless in fairness, sympathy, and mercy to James Earnest Watts, must be considered by you as extenuating or reducing the degree of his blame or punishment. You, as a juror, always have the option to sentence the defendant to life imprisonment, whatever findings you make.

However, we have held that mercy instructions are not required and that whether to so instruct the jury is within the discretion of the trial court. *Jackson,* 684 So. 2d at 1239; *Foster,* 639 So. 2d at 1301; *Jenkins v. State,* 607 So. 2d 1171, 1181 (Miss. 1992). In *Jackson*, the Court reiterated the language from *Jenkins* used in affirming the circuit court's refusal to grant a mercy instruction:

The recent decisions of this Court and of the United States Supreme Court enumerate that a mercy instruction is not required at trial. In *Ladner* [*v. State*, 584 So. 2d 743, 761 (Miss. 1991)], we held that a defendant "has no right to a mercy instruction." *Ladner*, 584 So. 2d at 761. In *Saffle v. Parks*,

[494 U.S. 484, 492-93, 110 S.Ct. 1257, 1262-63, 108 L.Ed.2d 415, 427-28 (1990)](#), the U.S. Supreme Court stated that the giving of a mercy instruction results in a decision based upon whim and caprice. Thus, the lower court was within its discretion when it denied the mercy instruction below.

*Id.* at 1239 (*quoting Jenkins*, 607 So. 2d at 1181). Likewise, in the case *sub judice*, the circuit court did not abuse its discretion in declining to allow Watts a mercy instruction.

### XIX. WHETHER MISSISSIPPI'S CAPITAL PUNISHMENT SCHEME IS UNCONSTITUTIONAL AS APPLIED TO THIS CASE AND ON ITS FACE

¶83. Watts next contends that Mississippi's capital punishment scheme is unconstitutional as applied to this case as well as on its face.[8] He concedes that this Court rejected the argument that it is facially unconstitutional in ***Holland v. State,*** 705 So. 2d 307 (Miss. 1997). He attempts, however, to distinguish his case from *Holland*, noting that the jury found only that he actually killed Vanessa Nicole Lumpkin and contemplated that lethal force would be employed, whereas in *Holland*, the jury found that the defendant actually killed, intended to kill and contemplated that lethal force would be employed.

¶84. Watts misconstrues the requirements of ***Enmund v. Florida,*** 458 U.S. 782 (1982) as incorporated in Miss. Code Ann. § 99-19-101(7)(1994), which applies "to any case in which pre-trial, trial or resentencing proceedings take place after July 1, 1994." The statute therefore is applicable to the case *sub judice*. Section § 99-19-101(7) expressly states:

> (7) In order to return and impose a sentence of death the jury must make a written finding *of one or more* of the following:
>
> (a) The defendant actually killed;
>
> (b) The defendant attempted to kill;
>
> (c) The defendant intended that a killing take place;
>
> (d) The defendant contemplated that lethal force would be employed.

§ 99-19-101(7)(1994)(emphasis added). Clearly, the jury need not make a written finding of any more than one of these four factors. *See **Holland***, 705 So. 2d at 319-20.

¶85. Watts further relies on ***Tison v. Arizona***, 481 U.S. 137 (1987), where the appellants did not actually murder the victims, but stood by while their father and his former cell mate killed them and then assisted in the escape and a shoot-out with police. He cites *Tison* for the proposition that to be executed, the felony-murderer must act with "reckless indifference to the value of human life . . . knowingly engaging in criminal activities known to carry a grave risk of death." *Id.* at 157. He asserts that there is no "credible evidence" that he acted with such recklessness since the jury did not expressly find that he intended to kill Vanessa Nicole Lumpkin. Watts further asserts that this absence of a finding of "intent to kill" should have been considered as a mitigating factor. *Tison,* however, is factually distinguishable from the case *sub judice* since the appellants did not actually participate in the killings. Moreover, even if we were to adopt the *Tison* standard, we cannot say the evidence does not support a finding of reckless intent or intent to kill when a child was strangled and sexually penetrated with such brutal force.

## XX. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE JURY TO BREAK FOR LUNCH DURING VOIR DIRE WITHOUT BEING SEQUESTERED AND TO OBTAIN THE AGREEMENT OF THE PARTIES TO ALLOW THE PETIT JURY TO GO HOME AFTER THEY WERE SWORN IN WITHOUT BEING SEQUESTERED

¶86. The jury was impaneled in Lincoln County. After the jurors were sworn, the parties agreed that they would be allowed a short time in which to pack some things at home before they were transported from Brookhaven to Columbia in Marion County that same afternoon, where they would be sequestered throughout the trial. The circuit court instructed the jurors not to read any newspapers, listen to the radio or talk with anyone about the case while they got ready. Watts now asserts that it was reversible error to so allow.

¶87. Rule 10.02 of the Mississippi Uniform Circuit and County Court Rules states that "[i]n any case where the state seeks to impose the death penalty, the jury shall be sequestered during the entire trial." There is no corresponding statutory directive, rather the rule stems from the common law rule of jury sequestration. *Wilson v. State,* 248 So. 2d 802, 803 (Miss. 1971). Watts, apparently laboring under the misapprehension that court rules are made by the Legislature, charges that "[t]he trial court indisputably violated this clear legislative directive." He then refers the Court to *State v. Watts,* 579 So. 2d 931 (La. 1991), which is totally irrelevant to the assignment of error at issue.

¶88. In *Wilson,* this Court found that despite agreement by the defendant that the jury could disperse for the night after the first day of trial in his capital murder case, allowing the jury to separate for the night after the first day of trial was reversible error. *Id*. at 803. It rejected the idea that any error was cured by the consent of the defendant, raising concerns about the prejudice that might befall a defendant asked to consent to a waiver of sequestration:

> In this case it is suggested by the counsel for the State that if there was any error in permitting the jury to separate, it was cured by the consent of the prisoner. We do not agree with counsel in this view of the law. We are of the opinion that the court has no power to authorize the separation of the jury during the trial of a capital case, either with or without the consent of the prisoner, except in cases of great necessity; and if it be done, and the prisoner be found guilty, a new trial will be granted. The prisoner ought not to be asked to consent. Who dare refuse to consent, when the accommodation of those, in whose hands are the issues of his life or death, is involved in the question? He would have to calculate the chances of irritation from being annoyed by a refusal on the one hand, and of tampering on the other. No consent of the prisoner in the extremity of his need, ought to bind him. He may really be unwilling to permit the jury to separate, but may consent for fear that his refusal may prejudice the jury against him.

*Id*. at 803-04 (*quoting Woods v. State,* 43 Miss. 364, 372-73 (1870)). This Court reiterated in *Cox v. State*, 365 So. 2d 627 (Miss. 1978) that in a capital case, "the jury shall be sequestered during the entire trial and this right cannot be waived either by the attorney for the accused or at the discretion of the trial court." *Id.* at 629. *See also Weaver v. State,* 272 So. 2d 636, 638 (Miss. 1973)("if this were a capital case, dispersal and separation of jurors would be reversible error even if permitted with the consent of the defendant."). *But see Barnes v. State,* 374 So. 2d 1308, 1309 (Miss. 1979)(in manslaughter case, failure to sequester jury was not error because Defendant agreed to procedure). In *Cox,* the jury was sent home for the night after the first day of trial in a capital murder case after the defendant became ill late in the day

and the judge determined that it would be impossible to arrange transportation and hotel rooms for the jurors. *Id*. at 628. As distinguished from ***Wilson, Woods*** and the case *sub judice,* however, counsel for the defense apparently did not agree to dispersing the jury. ***Id***.

¶89. In this case, as further distinguished from ***Wilson*** and ***Cox,*** although the jury already had been sworn, it had not yet heard opening arguments or the testimony of any witnesses. The jurors were not dispersed for any great length of time; rather, court was adjourned at 4:10 p.m. and they were directed to hurry back to the courthouse so that they might travel to Columbia that afternoon. There is no suggestion in the record that any of the jurors disregarded the court's instructions regarding discussion of the case.

¶90. None of the Mississippi cases address the situation now before this Court: where the jury has been permitted to disperse briefly after the completion of preliminary proceedings but before the actual trial and introduction of evidence. In the majority of other jurisdictions, where the common law practice of sequestration has been superseded by statute so as to allow waiver by consent, dispersal of the jury before the actual trial has not been found to be grounds for a new trial. Allen E. Korpela, Annotation, Separation of Jury in Criminal Case Before Introduction of Evidence--Modern Cases, 72 A.L.R 3d 100, 103 (1976 and Supp. 1995). In Louisiana, where the Criminal Code was amended in 1995 to relax the sequestration requirement so as to provide that "[i]n capital cases, after each juror is sworn he shall be sequestered, *unless the state and the defense have jointly moved that the jury not be sequestered.*" La. Code Crim. P., art. 791(B), it was noted that the restriction against wavier was premised on the idea that a "'[d]efendant ought not to be placed in the position of having to consent, or perhaps prejudice the jury by withholding consent.'" ***State v. Taylor,*** 669 So. 2d 364, 381 (La. 1996)(*quoting* ***State v. Luquette***, 275 So. 2d 396, 400 (La. 1973), overruled by ***Taylor***, 669 So. 2d at 381). As the ***Taylor*** court pointed out, concerns about prejudicing the defendant may be remedied by following the proper procedure, that is, by considering the issue of waiver of sequestration outside the presence of the jury and requiring both the state and the defendant to consent before sequestration may be waived. ***Id. See also*** ***State v. Robertson***, 712 So. 2d 8 (La. 1998).

¶91. The better practice would have been for the circuit court to advise venire members the night before final jury selection and swearing in to come to court with packed suitcases. However, allowing the jurors, with the consent of both parties, to go home and quickly pack their bags after they were sworn in but before they were sequestered for the actual trial and the introduction of any evidence, does not warrant reversal of the entire case for a new trial. The jurors were advised that both sides had agreed that they could have a few minutes to get their things ready. The potential for jury prejudice against the defendant upon which the rule against allowing any waiver of sequestration even with the defendant's consent is premised was eliminated when consent was obtained by both parties outside of the presence of the jury.

## IV.

¶92. While there is no merit to most of the issues raised by Watts in his appeal, we find that despite his acquiescence to the Sentencing Instruction No. 2 at trial, the circuit court committed reversible error in presenting the jury with only two sentencing options. The jury was instructed that it could sentence Watts to life in prison or death; the third option of life without the possibility of parole as required by § 97-3-21 was not presented. The circuit court found that because the offense was committed before the effective date of the statute, July 1, 1994, it was not applicable. However, the notes to the statute expressly state that "[t]he provisions of this act shall apply to any case in which pre-trial, trial or resentencing proceedings take place

after July 1, 1994." Watts' trial was held on August 5, 1996, more than two years after the effective date. We therefore reverse as to punishment and remand for a new trial on the sentencing phase only.

¶93. **CONVICTION OF CAPITAL MURDER AFFIRMED. SENTENCE OF DEATH REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, MILLS AND WALLER, JJ., CONCUR. BANKS, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN AND PITTMAN, P.JJ., AND WALLER, J. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS, J.**

**BANKS, JUSTICE, CONCURRING:**

¶94. I write separately to express my concern with the trial court's mishandling of *Batson* in this case. Defense counsel made the decision to waive *Batson* challenges; however, it was a decision which was wrongly induced by the trial court.

¶95. In the present case, we are presented with a trial court judge who improperly allowed waiver of *Batson* challenges. Counsel agreed to waive *Batson* in an effort to avoid having to provide the court with race-neutral reasons for its peremptory challenges. *See* ***Batson v. Kentucky*, 476 U.S. 79 (1986)**. The initial trial in this matter, held in Marion County, resulted in mistrial because the jury panel was exhausted without a jury being selected. In picking jurors for that trial, the trial court ordered both the State and defense counsel to state race-neutral reasons for their peremptory challenges prior to any objection or any finding of a prima facie case of discrimination. Defense counsel was unable to state race-neutral reasons for his peremptory challenges to the court's satisfaction in a number of instances where the reasons stated were, in fact, race neutral. A similar occurrence transpired in *Taylor v. State*, No. 97-KA-00560-SCT.

¶96. In *Taylor v. State*, No. 97-KA-00560-SCT, we concluded that the trial court erred in requiring the defendant to provide race-neutral reasons for its peremptory strikes without there first being a finding of a prima facie case of discrimination. *Id.* at 13. By invoking *Batson,* the defendant was not automatically required to come forward with race-neutral reasons for its strikes without an objection by the State and a showing that there existed a pattern of using peremptory challenges to exclude racial groups, contrary to what the trial court held. *Id*. at 14.

¶97. In this case, counsel's prior experience with *Batson* issues in the initial trial prompted him to waive *Batson* in the subsequent trial. In my view, however, counsel's decision was wrongly induced by the trial court, which had mishandled *Batson* in other cases. *See Taylor v. State*, No. 97-KA-00560-SCT.

¶98. The fact is, however, that there is no evidence of discrimination in the present case. For this reason, I concur with the majority opinion.

**SULLIVAN AND PITTMAN, P.JJ., AND WALLER, J., JOIN THIS OPINION.**

**SMITH, JUSTICE, DISSENTING**:

¶99. The majority reverses Watts' death penalty and remands for a new sentencing hearing because the trial judge failed to instruct the jury that the sentencing option of life without parole was available in the case at bar. I disagree and therefore dissent.

¶100. I dissented regarding this issue in *West v. State*, 1998 WL 334717 (Miss.). I adopt my views expressed in that case as the same issue relates to the case *sub judice*. I prefer to adhere to this Court's precedent cases of **Johnston v. State**, 618 So. 2d 90, 94 (Miss. 1993) and **Hill v. State**, 659 So. 2d 547, 552 - 559 (Miss. 1994).

¶101. I respectfully dissent.

**ROBERTS, J., JOINS THIS OPINION.**

1. Haller testified that based on her visual examination of the shorts, she further tested the stains for the possible presence of feces, and achieved a positive result. Watts moved for a mistrial, which was denied, but the circuit court instructed the jury to disregard the evidence.

2. Dr. Koehler, adjunct professor at the University of Texas School of Law and assistant professor at the University's Business School, is one of the leading authorities on the use (and misuse) of statistics in the presentation of DNA evidence. *See, e.g.* Jonathan J. Koehler, Audrey Chia & Samuel Lindsey, The Random Match Probability (RMP) in DNA Evidence: Irrelevant and Prejudicial?, 35 Jurimetrics J. 201-19 (1995).

3. Watts supports this assignment of error with Recommendation 3.2 of the 1996 NRC II Report, which provides that "Laboratories should participate regularly in proficiency tests, and the results should be available for court proceedings". Ironically, in Issue XV, Watts complains that the delays in his trial prejudiced him as the result of the publication of the 1996 NRC Report.) It further should be reiterated that neither the 1992 nor the 1996 NRC Reports were entered into evidence.

4. Baxter testified that when she returned to her apartment the next day, her door had been tampered with.

5. The only objection made was the renewal of a continuing objection to the introduction of enlarged photographs of the victim's injuries.

6. **Cabello v. State**, 471 So. 2d 332 (Miss. 1985), upon which Watts relies for this proposition, does not even suggest that alleged prosecutorial misconduct *must* be addressed on appeal even if no objections were made during trial. Rather, the Court merely addressed the assignment of error quite briefly, observed that no objection had been made at trial and found the Appellant's proposition to be without merit. *Id.* at 346.

7. Rule 403, which Watts cited in his objection to the enlarged photographs, provides that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

8. Watts filed a Motion to Declare the Death Penalty Unconstitutional on August 24, 1995. It does not appear from the record that Watts ever obtained a ruling on his motion.